## GREATER LOUISVILLE FIRST FEDER-AL SAVINGS & LOAN ASS'N v. STONE.

Court of Appeals of Kentucky.

May 29, 1951.

Rehearing Denied Nov. 2, 1951.

Davis, Boehl, Viser & Marcus, L. Frank Withers, Joseph E. Stopher and A. J. Deindoerfer, all of Louisville, for appellant.

James U. Smith, Jr., Marshall B. Woodson, Jr. and Smith & Smith, all of Louisville, for appellee.

STEWART, Justice.

This is an appeal from a judgment of the Jefferson Circuit Court, Common Pleas Branch, Third Division, rendered upon a directed verdict given by the circuit court against appellant and in which the jury assessed damages in favor of appellee for $15,000 for personal injuries sustained by the latter on the premises of appellant in Louisville, Kentucky.

Appellant, hereafter called "Greater Louisville", appeals, urging the following grounds for reversal: (1) That appellee was only a licensee on its premises, to whom it owed no duty other than to refrain from wilful misconduct; (2) that it was not shown to be guilty of any negligence whatever; (3) that the action of the court below in directing a verdict for appellee was seriously prejudicial to it and constitutes a reversible error; and (4) that the damages assessed by the jury are so excessive as to appear at first blush the result of passion and prejudice rather than of deliberative judgment.

The evidence, which is not in dispute, shows that on April 26, 1948, at about 4:00 p. m., Mrs. Iola Stone went to meet her husband, Kenneth P. Stone, an employee of Greater Louisville, at the close of his day's work to go home with him. Mrs. Stone, accompanied by her small son, Michael Brian Stone, then almost 15 months old, on reaching the building in which her husband was employed, took the elevator to the third floor where his office was located. The entire third floor was one room, used by Greater Louisville for closing loans. Arriving on this floor, Mrs. Stone proceeded immediately to her husband's desk, sat down and began talking to him. Meanwhile, she

permitted the child to wander about the room. A few minutes elapsed and they heard the child scream. Mrs. Stone reached the child first and saw that he was grasping an exposed radiator pipe just beyond her husband's desk. She immediately pried his hands loose from the pipe. The child suffered very severe burns to the palms and proximal phalanges of both hands. He was first under the care of a physician for six weeks and he underwent two delicate extensive skin grafting operations performed by Dr. Charles J. Armstrong, a plastic surgeon in Louisville. There is no doubt from the testimony of Dr. Armstrong that some permanent impairment to the child's hands exists, because of the fact that the skin grafted into the palms of the hands has a tendency to become dry and brittle and lacks the essential oiliness it should have. There was also testimony to the effect that the burns had affected the tendons in the fingers which might interfere with the gripping ability of the child in later years. All special damages, including medical bills, amounted to $766.

While we believe the record in this case amply sustains the contention of appellant that Michael Brian Stone was a licensee on the premises of Greater Louisville at the time he received his injuries, we have concluded to base our decision upon the second ground urged by appellant, namely, that it was not shown at the trial that the child was hurt as a result of any negligence upon the part of Greater Louisville. Since our determination of this case will turn upon this sole issue, we reserve our consideration of all other questions raised by appellant.

The evidence reveals the fact that Greater Louisville in 1946 did extensive remodeling of its office building. At the trial, one of the architects who prepared the plans and supervised the work, the superintendent who performed the contract and the sub-contractor who put in the plumbing and heating fixtures, all testified, without qualification, that the installation of the radiators and the pipes connected therewith was done in a modern, approved manner and in accordance with all building code regula-

tions. They all stated that it was not customary or usual to cover radiator pipes, unless it was desired to prevent loss of heat and increase the efficiency of the heating system. Even radiators, they said, were covered in most instances for the sake of appearance only.

Mr. Clifford Lewis, a heating engineer and consultant, was called as an expert witness in behalf of appellant. He stated, after testifying that Greater Louisville's heating system had been installed in accordance with present day standards, that he had prepared specifications for heating in various schools, hospitals and other public institutions frequented by children, and that he had never known a case where the return pipes on radiators were required to be insulated. This same witness produced specifications at the trial covering housing projects in Louisville which provided that all return pipes to radiators should not be covered.

Appellee, through counsel, bases his case upon the theory that the exposed radiator pipes on appellant's premises constitute what he calls a "lurking peril", or a danger per se to children; and, although he admits that his cause of action is not predicated upon the attractive nuisance doctrine, since the child was not a trespasser at the time of his injury, he undoubtedly relies upon this doctrine when he contends that the tendency of Michael Brian Stone to exploit his curiosity is a childish trait appellant should have taken reasonable measures to guard against. We cannot follow this line of argument in its application to the facts herein.

We think the principle of law announced in Haar v. Vogelman Bakery Company, 312. Ky. 307, 227 S.W.2d 423, determines appellant's liability in the case at bar. The facts in this case were that James Hyland, a young boy, went with Louis Haar, age 8, to Vogelman's garage where Hyland poured some gasoline into a small can out of a container with a spout on it kept by Vogelman by his gasoline pump. The two boys then went out on the sidewalk where Hyland took a brush and smeared the gasoline on some paper caps. He next hit the

caps with a rock, causing them to explode. The explosion set the gasoline on fire in the can and, in an effort to put out the fire, Hyland kicked the can over. Gasoline was thrown on Haar, who caught fire, and his leg was severely burned. As is contended here, Haar's counsel argued that Vogelman permitted children of tender years to come about the garage and that a duty was imposed upon Vogelman to see that children congregating there were protected from anything that might arouse their curiosity and lead them to danger. In deciding this case, this Court, quoting from Dahl v. Valley Dredging Co., 125 Minn. 90, 145 N.W. 796, 797, 52 L.R.A.,N.S., 1173, said:

" * * * It is a matter of common knowledge that both kerosene and gasoline are usually kept in the majority of households, and are seldom so guarded that children cannot get possession of them, if they should attempt to do so. These liquids are not naturally attractive to children and are dangerous only when brought in contract with fire. * * *

"If defendant was negligent under the facts of this case, every householder who permits a can of gasoline or kerosene to remain where a neighbor's child has access to it is likewise negligent. * * *

"The care taken by people generally to prevent injury from articles in common use is a proper guide for the courts in determining what constitutes due care in respect to such articles. The law does not exact a degree of care regarding any article which will make the great majority of the possessors of that article chargeable with habitual or continuous negligence."

■■ In the instant case, an uncovered radiator pipe is a thing in common use. It is a matter of common knowledge that uninsulated radiator pipes exist everywhere. There is no difference in principle between an exposed radiator pipe and an unguarded hot coal stove. Formerly, coal stoves were in general use and are still to be found in most rural homes and in many small town business places. A hot object is not inherently attractive to children and is dangerous only when contact is made with it. No one would assume, or even argue, that a country merchant would be liable to a child that came into his store and received a burn by touching a red hot stove. With reference to radiators, and likewise with hot stoves, the practice of not covering or guarding them is so usual and widespread that no property owner should be held to anticipate that any injury would ever occur by reason of the existence of such a commonplace condition.

We cannot read into this case positive, active negligence upon the part of appellant. The care taken by people generally to prevent injury from instruments of common use is the proper criterion for courts to consider in determining what constitutes due care with respect to the use of such instruments. An uncovered radiator pipe is an instrument in common use, and it is a standard, approved practice to leave radiator pipes exposed. Therefore, having and keeping radiator pipes uncovered in a building, is not a negligent act upon the part of the possessor of property.

Appellee relies strongly upon Kentucky & West Virginia Power Co. v. Stacy, 291 Ky. 325, 164 S.W.2d 537, 170 A.L.R. 1, to sustain his cause, but the Stacy case is distinguishable from the instant one, because the possessor of the property had actual knowledge of the presence of gas escaping into the property and, furthermore, on the morning of the accident, its agents allowed workmen to use an alcohol torch with an open flame in the building, thereby precipitating the explosion which injured Stacy. An exposed radiator pipe cannot be placed in the same category with explosive, escaping gas. Nor do we think that the facts in Gray v. Golden, 301 Ky. 477, 192 S.W.2d 371, fit the facts of the case at bar. Many other decisions are cited by appellee, involving the attractive nuisance doctrine, which do not apply here. Obviously each attractive nuisance case is governed by its own peculiar facts.

Wherefore, the judgment is reversed, with directions to set it aside and to enter a directed verdict for appellant if the evidence should be the same on another trial.